# EXHIBIT A



April 30, 2024

*Familias Unidas por la Justicia vs. United States Department of Labor*
Expert Declaration of Marshall Steinbaum
Utah Economic Consulting Group, LLC

I am an Assistant Professor of Economics at the University of Utah. My research expertise concerns wage-setting, regulation, and market structure in imperfectly-competitive labor markets. My academic work on those subjects has been published in the *Journal of Human Resources*, *Labour Economics*, *Research in Labor Economics*, *Journal of Economic Literature*, *University of Chicago Law Review*, *Antitrust Bulletin*, and *Law and Contemporary Problems*, among others.

I have been asked to review the United States Department of Labor's 2022 prevailing wage rules regarding the H-2A agricultural worker visa program. Specifically, I have reviewed two aspects of the 2022 prevailing wage regulation and its application as to whether they are consistent with a factual understanding of labor economics and with the purpose of the H-2A visa statute, which is to ensure the H-2A visa program does not undermine the wages and working conditions of domestic farmworkers.

1. 20 C.F.R. § 655.120(c)(1)(ix) – the "25% rule," which requires non-determination of a prevailing wage for a crop activity in which a single employer accounts for 25% or more of the workers reported in the most common method of pay.
2. The division of piece-rate survey data into multiple wage units as part of the prevailing wage finding process, as that practice relates to the 25% Rule.

As part of my analysis, I reviewed the attachments to the forms ETA 232 provided to DOL by the Washington State Employment Security Department (ESD, or "the agency") for the 2022 prevailing wage survey in Washington State. The files I reviewed were the same files provided to Columbia Legal Services pursuant to FOIA.

My conclusions are:

- That the 25% rule, which was borrowed from 1996 healthcare industry antitrust guidance that has now been rescinded as outdated by the Department of Justice and the Federal Trade Commission, is not an appropriate tool to accomplish DOL's goal of obtaining "reliable" prevailing wages.
- That the 25% rule acts to deregulate the labor markets most in need of regulating: those in which one or more dominant employers have wage-setting power and use it unilaterally or collectively to reduce wages or worsen working conditions for competitive advantage.

M. STEINBAUM DECL. - 4

Marshall Steinbaum
Page Two

- That the 25% rule is therefore inconsistent with the statute, because it acts to the detriment of workers engaged in agricultural labor.
- That the agency's stratification of reported wage data increases the use of the 25% rule and thereby undermines setting prevailing wages based on piece rates, either in favor of hourly wage rates (which are lower) or resulting in the non-determination of a prevailing wage altogether.
- Based on my research and experience, I am unaware of any similar application of a 25% rule that eliminates prevailing wages by discarding government-gathered survey data.

**The DOJ and FTC Have Abandoned the 25% Rule**

The Notice of Proposed Rule-Making for the 2022 prevailing wage rule states that the 25% rule was proposed "so that the wage is not unduly impacted by the wages of a single dominant employer" and explained that the rule was borrowed from Statement 6 of the Antitrust Enforcement Policy in Health Care ("enforcement policy"), August 1996, available at http://www.justice.gov/atr/public/guidelines/0000.htm:

> [The 25% Rule is] consistent with the 'safety zone' standards for exchanges of employer wage information established by the Department of Justice and the Federal Trade Commission in the antitrust context. Specifically, absent extraordinary circumstances, DOJ or FTC will not challenge as a violation of antitrust law the exchange of information regarding employer wages that meet the requirements for the safety zone.
>
> While the enforcement policy was developed for exchanges of information in the health care industry, the policy has been recognized to offer significant insights that go beyond health care, including a very useful framework for analyzing information exchanges.[1]

Several points should be made about this supposed antitrust-enforcement-related precedent for the 25% rule:

1. The actual guidance document in which it appears was withdrawn *in toto* by both the DOJ and FTC in 2023, thus undermining the DOL's primary reason for using the rule—that it is a widely-respected rule used by other agencies. The DOJ's press release regarding the withdrawal of the guidance states

   > The statements are overly permissive on certain subjects, such as information sharing, and no longer serve their intended purposes of providing

---

[1] 84 Federal Register 36168, 36188 and fn.52, https://www.federalregister.gov/d/2019-15307/p-195

2

Marshall Steinbaum
Page Three

       encompassing guidance to the public on relevant healthcare competition issues in today's environment.[2]

The DOJ's statement that the withdrawn guidance was overly permissive with respect to information-sharing indicates that agency no longer considers the 'safety zone' to be justified or consistent with statute.

2. Moreover, the 25% rule in the H-2A context concerns information-sharing with regulators in service of carrying out their regulatory function, not information sharing between industry participants, as in the antitrust context. Application of the antitrust rule to information-sharing with regulators is non-sensical because information-sharing among industry participants is legally suspect (hence, the guidance document that has now been withdrawn), whereas information-sharing with regulators is exactly what the law requires.

    The purpose of the prevailing wage provision in the H-2A visa program is to regulate labor markets at risk of adverse consequences to workers, primarily the protection of domestic farmworkers from the downward pressures due to the importation of vulnerable foreign workers who will accept lower wages and working conditions. The regulatory function is necessary because of the risk of harm to workers from the use of foreign agricultural labor—harm that is likely to be the more severe the fewer employers there are in a given labor market. To return to the antitrust logic, the premise of the prevailing wage statute is that competition in the labor market is not sufficient to regulate pay for workers in this sector by itself, so the regulator must determine a prevailing wage to ensure workers are paid market rate. The 25% rule, which acts to prevent the determination of a prevailing wage, therefore defeats the purpose of the statute, which is to protect workers from harm.

3. Most importantly, safe harbors for employer coordination contained in DOJ/FTC guidance for enforcing Section 1 of the Sherman Act are irrelevant to, in fact at odds with, the question of prevailing wage determination. The purpose of those safe harbors from presumed liability under Section 1 of the Sherman Act is to inform industry participants when coordination will be presumed competitively benign. The logic of the safe harbor is that the competitive effect of an information exchange when there are sufficiently many market participants is likely muted, because in response to any one exchange leading to adverse consequences for counterparties (e.g., collusion to lower pay), affected workers could seek employment with one of many competing employers who are not party to the exchange or the agreement. To generalize, the use of a 25% safe harbor in healthcare implies that this is a labor

---

[2] Department of Justice, "Justice Department Withdraws Outdated Enforcement Policy Statements," February 3, 2023, https://www.justice.gov/opa/pr/justice-department-withdraws-outdated-enforcement-policy-statements.

Marshall Steinbaum
Page Four

market with many employers does not need to be regulated (i.e., through antitrust enforcement of Section 1), because competition will regulate it sufficiently. That is at odds with the premise of the H-2A statute, which is that labor markets in which foreign agricultural workers are employed need to be regulated.

**The Agency's Application of the 25% Rule Directly Leads to Fewer Prevailing Wage Determinations**

For each agricultural activity, the procedure enacted by the 2022 rule first computes the "majority method of pay" by analyzing the survey responses of each employer, who may report an hourly wage rate, a piece rate, or some combination of the two (for example, a piece rate with a minimum hourly wage guarantee, or a piece rate with a bonus for hitting a target). Piece rates can vary within an activity in and of themselves, for example if different employers use different bin sizes or other unit of measurement, or the same bin size but with different hourly wage guarantees or bonuses. Moreover, the way the prevailing wage determination is implemented, simply not answering the survey question about the details of the piece rate (e.g., answering 'not sure' with respect to bin size) constitutes a distinct method of pay from those employers who report a piece rate and specify how it is computed. When all the survey responses are categorized in this way, then the majority method is determined, then the 25% rule is applied.

I have reviewed 2022 harvest survey data collected from Washington cherry, apple, and pear growers and the agency's practice of computing a prevailing wage and applying the 25% rule. In virtually every instance, the 25% rule has resulted in the elimination of large swaths of survey data that could have supported a prevailing wage finding for farmworkers.

A prime example is the wage survey conducted for general cherry harvesting. 103 survey responses were received, with 81% of respondents indicating a piece-rate was paid. The department then selected 32 responses that offered a simple piece rate (as opposed to one that includes an hourly guarantee or a bonus) and calculated 27 cents a pound was the prevailing wage. However, the agency then applied the 25% rule and determined that the largest employer in this data set accounted for 25.5% of reported workers and eliminated all wage data.  The end result was "no finding," resulting in a default to the H-2A minimum hourly wage. To discard the entire data set is illogical and contrary to the goal of the prevailing wage process. The department's extreme application of this rule, therefore, resulted in no prevailing wage for an agricultural activity that accounts for $900 million of annual revenue for Washington State orchardists and employs significant numbers of H-2A agricultural workers.

A review of the 2022 apple harvest data indicates that the department eliminated prevailing wage findings for three of the top five apples harvested (by volume) in Washington State. This

4

Marshall Steinbaum
Page Five

occurred because the agency created a special wage category for one grower who did not report the size of its apple bins and instead wrote "not sure." By creating a unit of pay wage category with one employer, ESD guaranteed that the prevailing piece-rate pay would fail the 25% rule, as one employer always employs 100% of the workers. Thus, vast quantities of piece-rate wage data for important apple crops were eliminated, which resulted in no finding instead of a prevailing wage piece-rate.

Given how many possible answers there are with respect to setting a piece rate, including guarantees, bonuses, bin dimensions, units, etc., stratifying them so finely makes it much more likely the 25% rule will be triggered and no prevailing wage determination is made.

**The Effect of Employer Dominance on Pay**

My research concerns the consequences for workers of imperfect competition in labor markets. While defining 'imperfect competition' is inherently contentious and subject to debate among both scholars and policy-makers, there is essentially no dispute that 1. Fewer employers in a labor market contributes to adverse consequences for workers, through the mechanism of imperfect competition leading to unilateral wage-setting power on the part of employers,[3] and 2. When labor markets are imperfectly competitive, most or all workers in that market suffer adverse consequences, not just the workers who work for the dominant employer(s).[4] That is because an anti-competitive wage reduction by a dominant employer means other workers lose the ability to take a better-paying job, which in turn reduces the wage their own employer has to pay to retain them. Hence, labor markets with few employers are prone to wage reductions.[5] When there are few active employers in a labor market, enacting a minimum or regulated wage floor serves to increase both the wages workers get paid and the total number of jobs.[6]

Part of the scholarly research on imperfect competition in labor markets also pertains to the effect of foreign worker visa programs on employer conduct, and therefore on pay. That literature concludes that where employers have recourse to foreign workers with weaker bargaining power, they have an incentive to adopt lower-wage business models which

---

[3] Anna Sokolova and Todd Sorensen, "Monopsony in Labor Markets: A Meta-Analysis," *ILR Review* 74, no. 1 (January 1, 2021): 27–55, https://doi.org/10.1177/0019793920965562.

[4] Justin C. Wiltshire, "Walmart Supercenters and Monopsony Power: How a Large, Low-Wage Employer Impacts Local Labor Markets," Working Paper, December 2023, https://justinwiltshire.com/walmart-supercenters-and-monopsony-power.

[5] José Azar, Ioana Marinescu, and Marshall Steinbaum, "Labor Market Concentration," *Journal of Human Resources* 57, no. S (April 1, 2022): S167–99, https://doi.org/10.3368/jhr.monopsony.1218-9914R1.

[6] José Azar et al., "Minimum Wage Employment Effects and Labor Market Concentration," *Review of Economic Studies*, 2023; Wiltshire, "Walmart Supercenters and Monopsony Power: How a Large, Low-Wage Employer Impacts Local Labor Markets."

5

M. STEINBAUM DECL. - 8

Marshall Steinbaum
Page Six

discourage domestic workers in favor of foreign workers earning lower wages.[7] That basic intuition is the reason for the prevailing wage provisions of the H-2A visa program: to prevent it from adversely affecting domestic farmworkers and their ability to bargain for wages in a competitive marketplace.

The 25% rule therefore carves out from regulation exactly those labor markets that most need to be regulated: those in which a dominant employer may be in a position to exert downward wage pressure on both the wages it pays its own workers and the wages that other employers pay. The reason the regulator gives for the 25% rule is couched in the unreliability of wage reports when too few employers are sampled, and it is appropriate to take steps to ensure the reliability of the wage data on which a prevailing wage determination is based. But simply throwing away the data when too few employers are present, or when one employer predominates in the collected data sample, defeats the purpose of the regulation. If anything, those are the labor markets in which regulation should be most active at countervailing the bargaining power of employers.

If the problem with the 25% rule is that it carves out of wage regulation exactly those activities that most need to be regulated because they are most at risk of adverse consequences for workers from employer dominance, the implementation of the rule after the majority method of pay is determined intensifies the adverse consequences for domestic farmworkers. Short of throwing away the data when the 25% rule is violated, a sensible alternative is to estimate the effect that employer dominance has on pay, and adjust *upward* the prevailing wage determination accordingly so as to preserve the benefit of a competitive market for labor.

---

[7] For example, Michael Amior and Jan Stuhler, "Immigration, Monopsony and the Distribution of Firm Pay," Working Paper (IZA Institute for Labor Economics, January 3, 2024), https://papers.ssrn.com/abstract=4682476.